PHILIP S. WARDEN (Cal. State Bar No. 54752)
THOMAS V. LORAN III (Cal. State Bar No. 95255)
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
philip.warden@pillsburylaw.com
thomas.loran@pillsburylaw.com

Attorneys for Appellant PASSPORT
MANAGEMENT, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>JANA W. OLSON,<br><br>    Debtor. | District Court Case Number<br>8:17-cv-01697-DSF<br><br>Bankruptcy Court Case Number<br>8:15-bk-12496-TA<br><br>Adversary Case No.<br>N/A |
| PASSPORT MANAGEMENT, LLC,<br><br>      Appellant,<br><br>    v.<br><br>RICHARD A. MARSHACK,<br>Chapter 7 Trustee,<br><br>      Appellee. | **BRIEF OF APPELLANT PASSPORT MANAGEMENT, LLC** |

4851-7346-5943.v1

1
2

## CORPORATE DISCLOSURE STATEMENT

3   Appellant Passport Management, LLC is a limited liability company that is wholly
4   owned by Passport Capital, LLC, a limited liability company of whose
5   membership interests no publicly held corporation owns 10% or more.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS .................................................................................... ii

TABLE OF AUTHORITIES .................................................................................v

INTRODUCTION.................................................................................................1

STATEMENT OF JURISDICTION......................................................................2

ISSUE PRESENTED FOR APPEAL ...................................................................3

STANDARD OF REVIEW ..................................................................................3

STATEMENT OF THE CASE..............................................................................4

   I.     Background and Relevant Procedural History ...........................................5

      A.    Passport's State Court Action Resulted in Judgments Against Debtor 5

      B.    Debtor Files Chapter 7 Petition to Avoid State Court Contempt Proceedings and Files False and Misleading Schedules .......................8

      C.    Debtor Found In Contempt For Refusal to Comply with Statutory Disclosure, Cooperation, and Turnover Obligations........................... 11

      D.    Debtor Voluntarily Stipulates in Open Court that She Will Take All Actions Necessary to Turn Over All Assets to Trustee ...................... 12

      E.    Further Contempt Proceedings Arising from Debtor's Failure to Comply with Stipulation Order and Attempt to Dissuade Cook Islands Trustee from Repatriating Trust Funds ............................................... 14

      F.    Bankruptcy Court Rules that Debtor Is Not Entitled to Bankruptcy Discharge for Any Claim.................................................................... 17

      G.    Passport Allowed First-In-Priority Claim Status ................................ 18

   II.    Facts and Procedural History Regarding Trustee's Compromise with the Children's Trust, Motion for Approval and  Related Proceedings, and Bankruptcy Court's Approval Order ...................................................... 20

4851-7346-5943.v1

A.    Trustee's "Compromise" with Children's Trust ................................. 20

    1.    Trustee Seeks Out the "Assistance" of Debtor's Family in Repatriating Funds in Exchange for a Significant Portion of the Recovery ...................................................................... 20

    2.    Terms of the Compromise Agreement and Resulting Funds Transfers from Cook Islands Trust ............................................... 21

B.    Trustee's Motion for Approval of Compromise ................................. 23

C.    Tentative Ruling and Hearing on Trustee's Motion.......................... 24

    1.    Bankruptcy Court's Tentative Ruling in Favor of Trustee's Motion for Approval .................................................................. 24

    2.    Motion Hearing ......................................................................... 26

D.    Bankruptcy Court Approves the Compromise and Passport Appeals 31

SUMMARY OF THE ARGUMENT ...................................................................... 32

ARGUMENT ......................................................................................................... 34

I.    The Approval Order Is a *Per Se* Abuse of Discretion Because It Violates the "Absolute Command" of Chapter 7's Priority Scheme..................... 34

A.    The Bankruptcy Court Had No Discretion to Permit a Distribution That Violates Priority Without Passport's Consent ........................... 35

B.    The Funds at Issue Are Irrefutably Property of the Estate and Subject to Passport's First-in-Priority Claim .................................................. 37

II.    Approving a "Compromise" that Rewards Debtor's Fraud and Contempt and Undermines the Bankruptcy Code's Procedural Safeguards Was Also a *Per Se* Abuse of Discretion................................................................. 40

A.    The Compromise Should Not Be Approved Because It Is Not "Fair and Equitable" for the Creditors......................................................... 41

B.    The Compromise Undermines the Objectives of the Bankruptcy Code......................................................................................................... 44

iii

1   CONCLUSION .................................................................................................. 45

2   CERTIFICATE OF COMPLIANCE ................................................................ 47

3   PROOF OF SERVICE BY ECF AND OVERNIGHT COURIER ........................ 48

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

4851-7346-5943.v1

# TABLE OF AUTHORITIES

## Cases

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017).................................................................. passim

*F.T.C. v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ..................................................... 15

*Goggin v. Division of Labor Law Enforcement of California*,
    336 U.S. 118 (1949)...................................................................... 34

*Husky International Electronics, Inc. v. Ritz*,
    136 S. Ct. 1581 (2016).................................................................. 20

*In re Arden*,
    176 F.3d 1226 (9th Cir. 1999) ................................................. 3, 31

*In re de Armond*,
    240 B.R. 51 (C.D. Cal. 1999) ...................................................... 40

*In re Debbie Reynolds Hotel & Casino, Inc.*,
    255 F.3d 1061 (9th Cir. 2001) ................................... 3, 31, 33, 39

*In re Fryar*,
    570 B.R. 602 (Bankr. E.D. Tenn. 2017) ................................. 39, 43

*In re Lazar*,
    237 F.3d 967 (9th Cir. 2001) ......................................................... 2

*In re Merle's, Inc.*,
    481 F.2d 1016 (9th Cir. 1973) ....................................................... 2

*In re MGS Mktg.*,
    111 B.R. 264 (B.A.P. 9th Cir. 1990) ............................................ 40

*In re Woodson*,
    839 F.2d 610 (9th Cir. 1988) .................................................. 32, 39

*Koon v. United States*,
    518 U.S. 81 (1996)................................................................... 3, 33

4851-7346-5943.v1

*La Grand Steel Products Co. v. Goldberg (In re Poole, McGonigle &*
   *Dick, Inc.)*,
      796 F.2d 318 (9th Cir. 1986) ................................................................ 3

*Martin v. Kane (In re A & C Properties)*,
      784 F.2d 1377 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986) ...................... 40

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re*
   *Iridium Operating LLC)*,
      478 F.3d 452 (2nd Cir. 2007) ................................................................ 35, 40

*U.S. v. Speers*,
      382 U.S. 266 (1965) ................................................................ 34

### Statutes and Codes

California Civil Code
   Section 3439, *et seq.* ................................................................ 5, 9

United States Code
   Title 11, Section 105(a) ................................................................ 10, 11
   Title 11, Section 157(b) ................................................................ 1, 39
   Title 11, Section 521 ................................................................ 8, 10
   Title 11, Section 523(a) ................................................................ 17
   Title 11, Section 523(a)(2)(A) ................................................................ 17
   Title 11, Section 523(a)(6) ................................................................ 17, 19
   Title 11, Section 542 ................................................................ 10
   Title 11, Section 548(e) ................................................................ 19, 20, 22
   Title 11, Section 725 ................................................................ 33, 34, 39
   Title 11, Section 726 ................................................................ 33, 34, 39
   Title 11, Section 727(a) ................................................................ 17
   Title 11, Section 727(a)(2) ................................................................ 17
   Title 11, Section 727(a)(4) ................................................................ 17
   Title 28, Section 1334 ................................................................ 1
   Title 28, Section 157(b) ................................................................ 1
   Title 28, Section 158(a)(1) ................................................................ 2
   Title 28, Section 158(c)(1)(A) ................................................................ 2

4851-7346-5943.v1

1

## Rules and Regulations

2    Federal Rules of Bankruptcy Procedure

3        Rule 8002 ........................................................................2
    Rule 8002(a)....................................................................2
4        Rule 8015(a)(7)(B)(i)...................................................... 46
    Rule 9019 ................................................................ 38, 40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4851-7346-5943.v1

# INTRODUCTION[1]

The Debtor in this case, Jana Olson, has fraudulently – but with some significant success to date – scattered millions of dollars of her assets around the globe in order to hide them from her creditors, in particular the Appellant, Passport. She has also refused to comply with orders of the Bankruptcy Court and the California state court regarding the turnover of assets and information relating to her adjudged debts to Passport, and was jailed for contempt by both as a result. Under the appealed compromise agreement, Debtor managed to convince the Chapter 7 Trustee to allow her to carve off another $1 million in fraudulently transferred assets for her children, and the Bankruptcy Court to approve it, essentially by driving the Bankruptcy Court and the Trustee to exasperation.

But the Trustee had no legal authority to gift Debtor's children with funds that are part of the bankruptcy estate, subject to Passport's first-in-priority lien. Moreover, the deal struck with Debtor and her family undermines the objectives of the Bankruptcy Code by rewarding fraud and contempt. The Bankruptcy Court approved the Compromise in significant part because the Debtor had already caused the funds to be repatriated before the court's approval was ever sought –

---

[1] Record citations herein refer to the documents comprising the Record on Appeal, which are included in the attached Appendix (Volumes I (REC_001-REC_399) & II (REC_400-REC_767). In addition to the documents required under the Federal Rules of Bankruptcy Procedure and those designated by Passport, three additional documents have been included in the Appendix pursuant to the stipulation of the parties and Fed. R. Bankr. P. 8009(e) and filed in the Bankruptcy Court on December 4, 2017. *See* attached Declaration of Thomas V. Loran III Regarding Supplementation of Record on Appeal and attached as-filed stipulation.

1

but in the name of avoiding any perceived "duplicity" by the court – based on a deal that the court never made and Passport never approved – the Bankruptcy Court has instead effectively sanctioned fraud.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the Central District of California (Albert, J.) ("Bankruptcy Court") has jurisdiction over the core Chapter 7 bankruptcy proceedings in this matter under 28 U.S.C. §§ 157(b) and 1334, and General Order 242-A of the United States District Court, Central District of California. The Bankruptcy Court has authority under Federal Rule of Bankruptcy Procedure ("FRBP") 9019(a) to approve a compromise or settlement. An order of a bankruptcy court approving a settlement or compromise is a final, appealable order. *In re Lazar*, 237 F.3d 967, 985 (9th Cir. 2001) ("bankruptcy court order is final and thus appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed.") (citations omitted); *see also In re Merle's, Inc.*, 481 F.2d 1016, 1018 (9th Cir. 1973) ("An order approving a compromise … is final because it finally determines the rights of the parties. An order disapproving a compromise, however, is not final. It determines no rights and settles no issues.").

Appellate jurisdiction is proper here under 28 U.S.C. § 158(a)(1), which provides that a federal district court has jurisdiction over a bankruptcy appeal from final judgments, orders, or decrees. An appellant may elect at the time of the filing of the notice of appeal to have an appeal from a bankruptcy court heard by the district court instead of the bankruptcy appellate panel. FRBP 8001(e)(1); 28 U.S.C. § 158(c)(1)(A). Pursuant to FRBP 8001(a), "[a]n appeal from a judgment, order, or decree of a bankruptcy judge to a district court or bankruptcy appellate panel as permitted by 28 U.S.C. § 158(a)(1) or (a)(2) shall be taken by filing a

2

1   notice of appeal with the clerk within the time allowed by Rule 8002."  Rule

2   8002(a) provides that, "[t]he notice of appeal shall be filed with the clerk within 14

3   days of the date of the entry of judgment, order, or decree appealed from."

4     Passport's appeal concerns the Bankruptcy Court's September 18, 2017,

5   order approving a compromise agreement between the Trustee and the Olson

6   Children's Irrevocable Trust, a non-party to this action benefitting the Debtor's

7   children (the "Compromise").  (REC_169-REC_177).  Appellant timely filed its

8   Notice of Appeal and statement of election to have its appeal heard by the District

9   Court on September 26, 2017.  (REC_154-REC_168).  FRBP 8002(a).

## ISSUE PRESENTED FOR APPEAL

12     Whether the Bankruptcy Court erred in gifting $964,825.69 in property of

13   the Debtor's bankruptcy estate, over Appellant's objection, to a post-petition trust

14   established for the Debtor's children (the "Children's Trust") even though the

15   Bankruptcy Court had already determined that the Appellant had a first-priority,

16   secured lien over all of the property in the Debtor's estate and even though the

17   Chapter 7 Trustee and the Children's Trust had allegedly agreed that all of the fund

18   transfers to the Debtor's children, including all of the funds at issue in this appeal,

19   "are avoided, recovered by, and preserved for the benefit of the [Debtor]'s

20   bankruptcy estate."

## STANDARD OF REVIEW

23     A bankruptcy court's approval of a proposed compromise is reviewed for an

24   abuse of discretion.  *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061,

25   1065 (9th Cir. 2001).  A bankruptcy court's interpretation of the Bankruptcy Code,

26   however, is reviewed de novo, and, "[t]o the extent that the bankruptcy court's

27   approval of the settlement agreement rested on an erroneous interpretation of law,

28             3

it was, per se, an abuse of discretion." *Id.* (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)); *see also In re Arden*, 176 F.3d 1226, 1228 (9th Cir. 1999) ("'An exercise of discretion based on an erroneous interpretation of the law 'can be freely overturned.'") (quoting *La Grand Steel Products Co. v. Goldberg* (*In re Poole, McGonigle & Dick, Inc.*), 796 F.2d 318, 321 (9th Cir. 1986)).

## STATEMENT OF THE CASE

This appeal challenges the Bankruptcy Court's approval of a "compromise" agreement between the Appellee, Trustee Richard Marshack, and a post-petition trust specifically established for the benefit of non-parties to this action (the Debtor's children) (the "Compromise"). The Compromise gifted approximately $1 million in bankruptcy estate funds to the Children's Trust, ostensibly in exchange for the Debtor's family's assistance and Debtor's cooperation in repatriating approximately $4.3 million of the Debtor's assets that Debtor had fraudulently transferred a Cook Islands trust in order to avoid debts to creditors, including Passport. The Trustee argued that the deal – although it regrettably allowed Debtor to gift a million dollars out of the bankruptcy estate to her children – was necessary to recover any funds at all from the Cook Islands trust vehicle.

The record demonstrates otherwise. As the Bankruptcy Court found in the contempt proceedings against the Debtor, she always had the ability to cause the Cook Islands Trust funds to be repatriated and turned over to the bankruptcy estate. Yet, despite her promise to the Bankruptcy Court to do just that, Debtor instead dissuaded the Cook Islands trustee from repatriating the funds, and was jailed for contempt as a result. Debtor continued to refuse to purge her contempt for a year, and ultimately used her continued refusal (and incarceration) as leverage to – so far, successfully – retain a substantial portion of the fraudulent transfers for the benefit of her children.

4851-7346-5943.v1

In approving the Compromise, the Bankruptcy Court cited practical administrative considerations (such as the length and expense of the proceedings to date), but also its concern that disapproving the Compromise after the funds had been repatriated would be "duplicitous." This misperceives which action would dirty the court's hands – and so instead of stopping a fraud, the Bankruptcy Court sanctioned one, all in order to avoid reneging on a deal that the court never made.

In any event, the record – including the terms of the Compromise itself – establishes that the Cook Islands trust funds were at all times the property of Debtor's bankruptcy estate and subject to Passport's first-in-priority lien. The Trustee had no authority to agree to this priority-violating distribution, and the Bankruptcy Court had no discretion to approve it.

## I.      Background and Relevant Procedural History

### A.      Passport's State Court Action Resulted in Judgments Against Debtor

Passport's claim against Debtor is based on certain judgments and sanctions issued against her (and/or her alter egos) in Passport's favor by the Superior Court of and for Orange County, California ("Superior Court"). (*See* REC_290-REC_385 (Passport's Proof of Claim)). These judgments and sanctions were issued in an action Passport filed in the Superior Court on February 22, 2010, to recover the amounts due on six promissory notes and for relief under California's Uniform Fraudulent Transfer Act ("UFTA") (Calif. Civ. Code §§ 3439, *et seq.*) ("State Court Action")[2]. (REC_293 ¶2).

---

[2] *Passport Management, LLC vs. Erlend Olson, an individual; Jana Olson, an individual; Horse Power Investments, LLC a/k/a Horse Power LLC; Vistas Infinitas, LLC; Sugurbere Enterprises, LLC, Charmoya Enterprises, LLC, et al.*, Orange County Superior Court Case No. 30-2010-00346521. (*Id.*).

5

Passport served the Debtor with the summons and complaint in the State Court Action on April 30, 2010. (REC_696-REC_698).

The Superior Court entered three final, unappealed judgments in the State Court Action in Passport's favor:

1. A May 11, 2012 judgment in favor of Passport and against Erlend Olson[3] in the principal amount of $6,063,980.79, plus allowable costs and fees (the "May 2012 Judgment") (REC_294 ¶3(a); REC_299-REC_301), based on Mr. Olson's liability to Passport as holder of a series of promissory notes;

2. A June 12, 2014 judgment in favor of Passport, jointly and severally enjoining Horse Power Investments, LLC a/k/a Horse Power LLC and Vistas Infinitas, LLC (collectively, the "Shell Companies") **as transferees of $20,940,000 in fraudulently transferred funds, to satisfy the May 2012 Judgment**, plus Passport's recoverable costs (the "June 2014 Judgment") (REC_294 ¶3(b) (emphasis added); (REC_302-REC_312 (June 2014 Judgment)); and

3. A October 23, 2014 judgment in favor of Passport that Debtor, as the alter ego of the Shell Companies (and thus the transferee of $20,940,000.00 in fraudulently transferred funds), **"and any and all persons acting in concert with [Debtor], is hereby retained and enjoined to pay to [Passport]** *all of the aforesaid fraudulently transferred funds* **up to and including the entire amount of the unsatisfied and outstanding [May 2012 Judgment]** ... including all accrued post-judgment interest and all post-judgment costs claimed by

---

[3] Erlend Olson is Debtor's former spouse and the father of the beneficiaries of the Children's Trust.

4851-7346-5943.v1

[Passport] to date" in the then-current amount of $10,396,863.15 plus additional post-judgment interest and costs (the "October 2014 Judgment"). (REC_294 ¶3(c) (emphasis added); REC_313-326 (October 2014 Judgment, at ¶5).

The Debtor failed and refused to pay the October 2014 Judgment, in whole or in part. (REC_294 ¶4).[4]

On November 10, 2014, Passport filed a Notice of Judgment Lien with the California Secretary of State in connection with the October 2014 Judgment, and with also with the Superior Court on December 2, 2014. (REC_296 ¶9). On December 5, 2014, the Clerk of the Superior Court issued an Abstract of Judgment, which Passport duly recorded. (*Id.*).

A hearing to determine Debtor's contempt of the Superior Court's order to provide an accounting of assets in connection with the above judgment against her was scheduled for May 14, 2015. Immediately prior to the scheduled contempt

---

[4] The Superior Court also issued six monetary discovery sanctions against Debtor in favor of Passport; Debtor paid the first four of these (totaling $17,460), but failed or refused to pay the last two, totaling $7,370. (REC_294-REC_295 ¶¶5-6 and n.6). The Superior Court also issued three monetary discovery sanctions against, inter alia, the Shell Companies totaling $11,740. (REC_295 ¶7). As the alter ego of the Shell Companies, in accordance with the October 2014 Judgment, Debtor is liable to Passport for the monetary discovery sanctions against the Shell Companies, but failed or refused to do so. (REC_296 ¶8).

4851-7346-5943.v1

1   hearing, however, the State Court Action was automatically stayed by the Debtor's

2   bankruptcy petition.[5]

3   **B.    Debtor Files Chapter 7 Petition to Avoid State Court Contempt**

4   **Proceedings and Files False and Misleading Schedules**

5   Approximately three hours before the Superior Court contempt hearing was

6   scheduled to begin, Debtor filed a Chapter 7 Voluntary Petition for Bankruptcy in

7   the Bankruptcy Court on May 14, 2015.  (REC_215-REC_221 (Petition); *see also*

8   REC_733, ln. 18-19).  Appellee Richard A. Marshack ("Trustee" or "Appellee") is

9

10  [5] Debtor was later found in contempt of the Superior Court.  On July 15, 2015, the

11  Bankruptcy Court granted Passport's motion for relief from the automatic stay to

12  continue its prosecution of the State Court Action against non-debtor parties and

13  to compel the Debtor to comply with her obligation under the applicable

14  Superior Court judgment to render an accounting.  (*See* REC_014 at No. 60).

15  With the automatic stay lifted, the Superior Court contempt proceedings against

16  Debtor resumed and, following hearings in September 2015, the Superior Court

17  entered an order finding the Debtor in criminal and civil contempt of court, and

18  sentencing her to five days in jail, as well as further and indefinite confinement if

19  she did not meet her burden to demonstrate that she had purged her contempt.

20  The Debtor served the initial five days in jail. Debtor subsequently filed papers

21  that purported to – but did not – comply with the Superior Court's order in an

22  attempt to purge her contempt.  (REC_742, ln. 3-21).  She was re-incarcerated on

23  December 6, 2015, an remained in jail in Santa Ana pursuant to a series of orders

24  entered by the Superior Court and the Bankruptcy Court until January 26, 2016,

25  when Judge Albert of the Bankruptcy Court ordered Debtor released. (*See*

26  REC_043-REC_044, Nos. 211-212).

27

28                                   8

the duly appointed and acting Chapter 7 Trustee of Debtor's bankruptcy estate. (REC_535, ln. 18-19).

Debtor later admitted that her bankruptcy petition had been nothing more than a ploy to avoid the State Court Action contempt proceedings. (*See* REC_734, ln. 2-4 ("the whole bankruptcy was supposed to stop that whole contempt thing") (quoting transcript of Debtor's Sept. 9, 2015 341(a) Exam. at 321:19-20)).

Debtor filed the required schedules of assets and liabilities and statement of financial affairs[6] ("Schedules") in support of her petition on June 18, 2015, declaring under penalty of perjury that the information reported therein was true and correct. (*See* REC_222-REC_277). Debtor's subsequent conduct and testimony, however, made clear that her Schedules were – at best – deliberately misleading when filed, and included much inaccurate or incomplete information, as well as outright falsehoods. For example, among other omitted assets, Debtor's Schedules failed to disclose the assets of the Shell Companies, which the Superior Court had found to be Debtor's alter egos, or the assets of approximately 28 other juridical entities established for and controlled by the Debtor, including offshore entities which were the ultimate owners/repositories of the fraudulently transferred funds that were the subject of Passport's UFTA cause of action in the State Court Action. (REC_735, ln. 3-10). Debtor later admitted that she has assets in accounts "scattered everywhere" around the globe. (*See* REC_405, ln. 13-18).

One of these accounts was a self-settled Cook Islands trust account called the Miyim 2009 Cook Islands Trust ("Cook Islands Trust"), settled by Debtor in July 2009. (*See* REC_650, ln. 2-3; REC_655-REC_694). Pursuant to Schedule II of the Cook Islands Trust, Debtor named herself a beneficiary and member of the appointed class. (REC_650, ln. 3-4; REC_691). Article III(D) provides that

---

[6] *See* 11 U.S.C. § 521; FRBP 1007.

9

4851-7346-5943.v1

"during the lifetime of the [Debtor], the Trustee shall distribute the Trust Fund or any part thereof to such one or more members of the Appointed Class on such terms and conditions, either outright or in trust, the Settlor may from time to time appoint by a signed written instrument…" (REC_650, ln. 4-8; REC_660).

Although Debtor's Schedules acknowledged the existence of a "Miyim 2009 Cook Islands Trust," the Schedules identified Debtor only as the "Original settlor" and falsely stated that

> upon ifnormation [*sic*] and belief Trustee and Trust Protector since
> made changes to trust structure. Trust is defunded and defunct. Jana
> Olson has no current right to information.

(*See* REC_235). The trust was not "defunded" – Debtor later testified in 341(a) testimony the Trust was funded with approximately $4.6 million. (*See* REC_535 ln. 20-21).

Debtor's Schedules also did not disclose that, within days of being served with Passport's lawsuit (on April 30, 2010), on May 18, 2010, Debtor executed a letter dated May 6, 2010, directing the trustee of the Cook Islands Trust to amend Schedule II to remove Debtor as a named beneficiary – which the trustee then did, thereby transferring her beneficial interest in the trust to her children for no consideration. (REC_650, ln. 14-19; REC_700-REC_707; REC_708-REC_711). Trust records and other evidence show that Debtor had the continuing authority to direct the trustee to release Cook Islands Trust funds. (*See, e.g.,* 683 at Suppl. Loran. Decl., ¶¶ 3-5, Ex. A). Shortly before filing for bankruptcy, on January 14, 2015, Debtor directed that the Cook Islands Trust be re-named the "Pink Panther Trust." (REC_650-REC_651, REC_712-REC_713). There is no reference to a "Pink Panther Trust" in the Schedules.

In addition, Debtor's Schedules falsely state, *inter alia*, that no property had been "transferred by the debtor within 10 years immediately preceding the

4851-7346-5943.v1

commencement of this case to a self-settled trust or similar device of which debtor is a beneficiary" when in fact Debtor had made at least three transfers, including a transfer of $12 million in or around July 2010 – within weeks after being served with Passport's State Court Action – to the Cook Islands Trust, which as noted above, Debtor controls. (REC_735, ln. 21-REC_736, ln. 1-3, 15-19).

### C. Debtor Found In Contempt For Refusal to Comply with Statutory Disclosure, Cooperation, and Turnover Obligations

Given Debtor's continuing failure or refusal to comply with her legal obligations, on October 9, 2015, Trustee and Passport filed a joint motion requesting the court to compel her to do so. (*See* REC_018 at No. 88). The Bankruptcy Court issued an Order Compelling Debtor's Compliance with Statutory Disclosure, Cooperation, and Turnover Obligations Pursuant to 11 U.S.C. §§ 521, 542, and 105(a) on October 16, 2015 (REC_729-REC_730) ("Turnover Order"), ordering Debtor to (1) turn over to the Trustee within 10 days all of items in the itemized lists attached to the order that were in her possession, custody, or control, and (2) if any such items were not in her possession, custody, or control, to file a sworn declaration within 10 days affirmatively stating so. (*Id.*).

When Debtor failed to produce the assets and documentation enumerated in the Turnover Order, including records relating to the Cook Islands Trust, the Trustee and Passport moved for an Order to Show Cause Why Debtor Jana Olson Should Not Be Held In Contempt. (*See* REC_731-763). On December 8, 2015, the Bankruptcy Court issued an order finding Debtor in contempt (REC_278-REC_287) and, following a further evidentiary hearing on December 15, 2015, at which additional evidence showed that Debtor had still not purged her contempt, the Bankruptcy Court issued an Order of Civil Contempt and for Body Detention, and Debtor was taken into custody. (REC_288-REC-289).

11

4851-7346-5943.v1

On January 26, 2016, having found that Debtor had sufficiently partially purged her contempt, the Bankruptcy Court issued an order releasing the Debtor from custody. (*See* REC_043-REC_044, No. 212). The order also set a further status conference on "remaining issues under the Court's Contempt Order and/or cooperation between the Debtor and the Trustee for February 23, 2016, (*id*.; *see also* REC_046 at No. 220), later continued to March 15, 2016 (*See* REC_047, No. 226, REC_049, No. 240).

### D.    Debtor Voluntarily Stipulates in Open Court that She Will Take All Actions Necessary to Turn Over All Assets to Trustee

During the status conference hearing held before the Bankruptcy Court on March 15, 2016, Debtor voluntarily entered a stipulation with the Trustee on the record in open court ("Stipulation") agreeing to take all actions necessary to have all assets, including all of the assets held by the Pink Panther Trust, formerly known as The Miyim 2009 Cook Islands Trust (the "Cook Islands Trust"), turned over to the Trustee pending further written agreement between the parties or further order of the court. (REC_390-REC_396 (*Findings of Fact and Conclusions of Law in Support of Amended Order of Civil Contempt and for Body Detention* ("Findings of Fact and Conclusions of Law"))at REC_391REC-392, Findings of Fact ¶1).

The court memorialized the Stipulation in an "Order Approving Debtor's Stipulation to Turn Over Assets to Trustee" entered on March 29, 2016 ("Stipulation Order"). (*Id.* (*ref.* (REC_764-REC_767)). Prior to approving the Stipulation as an order, the Bankruptcy Court examined Debtor and accepted Debtor's representations that she was entering into the Stipulation voluntarily, of her own free will, and not under compulsion of any legal process or like authority. Those findings were incorporated into the Order Approving Stipulation.

4851-7346-5943.v1

(REC_392-REC-393, Findings of Fact ¶5).  The Order Approving Stipulation provides, in part:

> After due consideration and acknowledging that she was making this agreement of her own free will and not under compulsion of any legal process or like authority, **Jana Olson voluntarily agreed to take all actions necessary to have all assets, including all assets held by the [Cook Islands] Trust, turned over to the [Trustee]** to be held in trust pending further written agreement between the parties or further order of the Court. In furtherance of Debtor's voluntary agreement, **Debtor also agreed to sign all documents, advise all trust protectors, and communicate the words known by the trustee of the [Cook Islands] Trust and the trust protectors that this decision is made of her own free will and without duress**. Lastly, this agreement is made without waiver of, and Debtor expressly reserves, all rights, claims, and defenses regarding whether the funds held by the Trust constitute property of her bankruptcy estate. Accordingly, based on the stipulation read on the record and summarized above ("Stipulation"), and after questioning Debtor, the Court finds that she entered into this agreement knowingly, on her own free will, and in the absence of any duress...

(REC_392, Findings of Fact ¶1 (quoting REC_765) (emphasis added)).  This portion of the Stipulation is a specific and definite order of the Bankruptcy Court to turn over all assets including all assets in the Pink Panther Trust to the Trustee. (REC_395, Conclusions of Law, ¶1).

13

### E.   Further Contempt Proceedings Arising from Debtor's Failure to Comply with Stipulation Order and Attempt to Dissuade Cook Islands Trustee from Repatriating Trust Funds

Debtor was the sole settlor of the Cook Islands Trust and is educated, sophisticated, and experienced in business. (REC_392, Findings of Fact ¶2). Debtor had previously sent directions to the trustees of the Trust and had caused funds from the Trust to be withdrawn on approximately twenty separate occasions. (*Id.*, Findings of Fact ¶3). However, the Cook Islands Trust provides that the trustees are specifically instructed to ignore requests communicated to them by Debtor, the Trust's settlor, under circumstances of duress. (*Id.*, Findings of Fact ¶4).

On April 13, 2016, Debtor sent an email to several recipients including the trustees of the Cook Islands Trust, the trust protectors of the Trust, the Office of the United States Trustee, the Trustee, and the attorneys who represented Debtor regarding the Trust, among others. (REC_393, Findings of Fact ¶6). In that email, Debtor said many things that unmistakably communicated that Debtor was acting under duress, including that she felt she had been "been taken advantage of," that she had "been cooperating for over a year with the BK Trustee, and look at where [she is] today. Worse off than one year ago. Far worse off. Anything I say or any move I make is used against me, and the baby is already covered in tar[.]" (*Id.*). Debtor also complained that "Passport wishes to steamroll forward, without due process for [Debtor] to have good representation…," but that she was "happy to rot in jail for something [she] has no control over[.]" (*Id.*). The Debtor further stated that she does "not respond well to bullying and condemnation and violations of the Sustainable Principle of Nonviolation of Self, Children and Property…" "So please proceed with the crucifixion." (*Id.*).

14

On June 7, 2016, the Bankruptcy Court held a further hearing on the Order to Show Cause. (*See* REC_388-REC_389). The court found that "Debtor has control over the [Cook Islands Trust] funds and the ability to cause all assets held by the Trust to be turned over to the Trustee for at least the following reasons": (1) Debtor's sworn admission that she had previously caused funds to be withdrawn from the Trust; (2) iChat messages showing that Debtor retained control over her offshore assets; (3) Debtor's agreement to enter into the Stipulation, which constitutes an admission that she had control over the funds and the ability to cause all assets held by the Trust to be turned over to the Trustee; Debtor's representations on the record in open court regarding disclosure of the secret words that communicate to the trustee of the Cook Islands Trust that she wants actions to be taken and that she is not operating under duress; and Debtor's April 13, 2016 e-mail communicating that she was acting under duress, constituting an acknowledgment that Debtor's state of mind is relevant to the trustees of the Trust. (REC_393-REC_394, Findings of Fact ¶7).

The Bankruptcy Court also found that the Debtor had failed to turn over all assets to the Trustee, including any assets held in the Pink Panther Trust. (REC_394, Findings of Fact ¶8). The court concluded based on the foregoing facts that

> Clear and convincing evidence establishes that Debtor knowingly and willfully violated the Order Approving Stipulation by failing to turn over all assets to the Trustee, including all assets in the Pink Panther Trust, and by sending the April 13, 2016, e-mail that communicated that she was under duress, in contravention of the Order Approving Stipulation [...] (Dkt. 255) In doing so, Debtor could only logically have been attempting to thwart repatriation.

15

4851-7346-5943.v1

1 | (REC_395, Conclusions of Law ¶2). The Court also found that Debtor had made
2 | no attempt "to purge her contempt by communicating to the trustees and trust
3 | protectors of the Pink Panther Trust that she is acting of her own free will,
4 | voluntarily, and not under duress in seeking repatriation of all assets held in any
5 | Cook Islands Trust." (*Id.*, Conclusions of Law ¶6).

6 |     To the extent that Debtor argued that compliance with the Order Approving
7 | Stipulation was impossible, the Bankruptcy Court held that she had failed to
8 | present any admissible evidence to support that contention, and that, insofar as she
9 | had any present inability to repatriate the Cook Islands Trust funds, it was of her
10 | own making, and that she therefore could not excuse her failure to comply with the
11 | order. (*Id.,* Conclusions of Law ¶¶3-5 (citing *F.T.C. v. Affordable Media, LLC*,
12 | 179 F.3d 1228, 1240-1241 (9th Cir. 1999)).

13 |     In light of these findings and conclusions, the Bankruptcy Court found
14 | Debtor in civil contempt of the Order Approving Stipulation (REC_396,
15 | Conclusions of Law ¶7), and that there were no less severe alternatives to bodily
16 | detention to coerce the Debtor to purge her contempt, because (1) in the more than
17 | one year since Debtor filed the bankruptcy case Debtor had failed to comply with
18 | her duty to turn over her assets to the Trustee; (2) Debtor had been warned on
19 | multiple occasions that her failure to comply with orders of the court would lead to
20 | further civil contempt proceedings and bodily detention; and (3) Debtor's act of
21 | sending her April 13, 2016 email, which advised the trustees of the Trust that she
22 | was acting under duress, "was a flagrant act of contempt." (*Id.,* Findings of Fact
23 | ¶9).

24 |     At the conclusion of the June 7, 2016 hearing, the Bankruptcy Court issued
25 | an Amended Order of Civil Contempt and for Body Detention of Debtor Jana
26 | Olson. (REC_388-REC_389). On June 10, 2016, the Bankruptcy Court issued

16

4851-7346-5943.v1

written Findings of Fact and Conclusions of Law relating to its order.  (REC_390-REC_396).

The Debtor remained unwilling to purge her contempt with regard to the Cook Islands Trust funds – and thus she remained in jail for approximately one year following the June 2016 proceedings.

**F.    Bankruptcy Court Rules that Debtor Is Not Entitled to Bankruptcy Discharge for Any Claim**

Passport and the Trustee initiated an adversary proceeding against the Debtor (Adversary Case No. 8:15-01341 TA) (the "Adversary Case") in August 2015, challenging the dischargeability of her debts on grounds that, *inter alia*, (1) Debtor's debts to Passport were for money or property that was obtained by fraud and other willful and malicious conduct, and that (2) Debtor acted with the intent to hinder, delay, or defraud her creditors by transferring, concealing, or otherwise removing property from her direct control within one year of the petition date. (*See* REC_015-REC_016 at No. 74).

Passport and Trustee filed summary judgment motion in the Adversary Case on June 30, 2016.  (*See* REC_398, ln. 1-6)  The Bankruptcy Court granted the motion and entered a related Judgment against Debtor on October 19, 2016, holding that

> [Passport] is entitled to judgment against Debtor, pursuant to 11
> U.S.C. §§ 523(a)(2)(A) and 523(a)(6)[7], denying Debtor a discharge

---

[7] 11 U.S.C. §§ 523(a) states in relevant part: "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— … (2)(A) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a

17

for the indebtedness to Creditor that is represented by the two final Judgments and five monetary sanctions orders entered against Debtor and the Shell Companies in the State Court Action; [and]

Trustee and [Passport] are entitled to judgment against Debtor denying Debtor's discharge under 11 U.S.C. § 727(a)(2) as a result of Debtor's intent to hinder, delay, or defraud her creditors by transferring, concealing, and otherwise removing estate property after the date of the filing of the petition under 11 U.S.C. § 727(a)(4) because Debtor knowingly and fraudulently, in connection with the case, made a false oath or account[.][8]

(REC_398-REC_399).

### G. Passport Allowed First-In-Priority Claim Status

On April 15, 2016, Passport timely filed its proof of claim in the Chapter 7 case, which was assigned Claim No. 4 (REC_290-REC_385). Passport's claim is

---

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; … [or] (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

[8] 11 U.S.C. § 727(a) states in relevant part: "(a) The court shall grant the debtor a discharge, unless— …(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed— … (B) property of the estate, after the date of the filing of the petition; … [or] (4) the debtor knowingly and fraudulently, in or in connection with the case— (A) made a false oath or account[.]"

18

1  based on the judgments and awards made in Passport's favor against Debtor by the
2  Superior Court.  The Proof of Claim asserts that the amount Debtor owed to
3  Passport as of the Petition date was $11,590,628.98, plus interest and post-
4  judgment costs, including attorneys' fees, and that the entirety of the claim is
5  secured on account of Passport's actions to create judgment liens and in the
6  absence of any senior liens.  (REC_297, ¶7).

7      Recognizing that Passport's $11,590,628.98 claim, if it were allowed as a
8  secured claim, would prevent any other creditor from being paid, and that even if it
9  were unsecured, Passport's claim would comprise over 99% of the unsecured
10  creditor body, the Trustee proposed a compromise agreement to resolve all
11  disputes between Passport and the Trustee.  The agreement between Trustee and
12  Passport provides that "Passport shall have an allowed secured first-in-priority
13  claim in the principal amount of $11,590,628.98 ('Principal Sum Due')," and that
14  "all property recovered under any theory of law or by consent from trust(s) settled
15  by Debtor in the Cook Islands including the 'Pink Panther Trust' ... shall
16  constitute property of the estate subject to Passport's first-in-priority secured
17  claim."  (REC_421, ¶¶3-4).  In exchange for allowing Passport a first-in-priority
18  secured claim senior to all others, the agreement also provides a carve-out
19  sufficient to allow for pro rata payment of all administrative and currently
20  scheduled unsecured claims as if Passport's claim were not secured.  (REC_405,
21  ln. 24-26).

22      The Bankruptcy Court granted Trustee's motion for an order approving his
23  compromise with Passport for allowance of the secured claim and carve-out on
24  February 6, 2017 ("Priority Order").  (REC_527-REC_533).

25
26
27
28

19

1    **II.    Facts and Procedural History Regarding Trustee's Compromise with**
2    **the Children's Trust, Motion for Approval and  Related Proceedings,**
3    **and Bankruptcy Court's Approval Order**
4        **A.    Trustee's "Compromise" with Children's Trust**
5            **1.    Trustee Seeks Out the "Assistance" of Debtor's Family in**
6            **Repatriating Funds in Exchange for a Significant Portion of**
7            **the Recovery**

8        As discussed above, Debtor (1) self-settled the Cook Islands Trust in 2009,

9    (2) fraudulently transferred millions of dollars from the Shell Companies to the

10    Trust within weeks of being served with Passport's suit in 2010; (3) transferred her

11    beneficial interest in the Trust to her two minor children for no consideration in

12    2010, within days of being served by Passport, and (4) immediately prior to

13    bankruptcy, changed the name of the Trust to the "Pink Panther Trust," a name she

14    did not identify on her Schedules.  (REC_535, ln. 20-25).  Debtor also falsely

15    stated in her Schedules that the trust was "defunct and defunded."  (*Id.*).

16        In light of these facts, Trustee has contended throughout these proceedings

17    that the Debtor's creation and funding of the self-settled Cook Islands Trust was

18    avoidable pursuant to 11 U.S.C. § 548(e).[9]  (*See* REC_536, ln.1-4).   And, even if

19    they were not, Trustee has contended that Debtor's transfer of her beneficial

20    interest to her children for no consideration was also avoidable as an actually

21    and/or constructively fraudulent transfer, in particular because Debtor made the

22    transfer within days after being sued by what is now her largest creditor, Passport.

23    (*Id.,* ln. 4-8).

---

25    [9] "[T]he trustee may avoid any transfer of an interest of the debtor in property that
26       was made on or within 10 years before the date of the filing of the petition, if—
27       (A) such transfer was made to a self-settled trust or similar device[.]"

28    20

The Trustee argues that, because Debtor had been incarcerated for nearly one year for her refusal to repatriate the Cook Island Trust funds, it was necessary to enter into a compromise to gain the cooperation of Debtor, her former spouse Erlend Olson, and a court-appointed guardian for the children (Debtor's father, Barret Weekes), in order to obtain the Cook Island Trust funds. (*Id.* ln. 9-13). The Trustee represented that, in his business judgment, it was in the best interest of the Estate to enter into an agreement with the Weekes family and Debtor to pay Debtor's children approximately $1 million of the $4.3 million anticipated Cook Islands recovery (1) to avoid having to sue Debtor's children as the recipients of fraudulent transfers (which are non-dischargeable debts[10]), despite Trustee's confidence in the strength of that claim; (2) to preclude the possibility that the trust funds would never be returned; and (3) to heed the Bankruptcy Court's encouragement to find a solution that resulted in Debtor purging her contempt. (*Id.* ln. 16-25).

## 2.    Terms of the Compromise Agreement and Resulting Funds Transfers from Cook Islands Trust

The Compromise recites that [Debtor] made certain transfers [of funds] to [the Children], including naming them as primary beneficiaries of the [Pink Panther Trust]" and further recites that "[Trustee] claims that all funds transferred by [Debtor] to the Children[,] including the funds in the [Pink Panther Trust,] belong to [Debtor's] bankruptcy estate or that any rights of the Children to such funds are subject to avoidance and recovery as fraudulent transfers." (REC_547, Recitals C and F). The Compromise provides that

> The effectiveness of the consideration provided by the Trustee
> pursuant to this Agreement is contingent upon the Court entering an

---

[10]  *Husky International Electronics, Inc. v. Ritz,* 136 S. Ct. 1581, 1589 (2016).

21

4851-7346-5943.v1

order approving it. **Failure of the Court to approve this Agreement shall render such provisions void and without effect.** The date that the Court enters its order approving this Agreement shall be referred to as the "Effective Date."

(REC_548, ¶1 (emphasis added)).[11]

The Compromise expressly provides that "**all transfers of property by [Debtor] to the Children are avoided, recovered by, and preserved for the benefit of [Debtor's] bankruptcy estate.**" (*Id.* at ¶2) (emphasis added)). It also provides that: "[i]mmediately upon execution of this agreement, Barret [Weekes, Debtor's father] request all property transferred to the Children by Debtor be deposited into the Settlement Escrow Account related to the Children's Trust ..." and that "[w]ithin one business day after funds are received and become available for withdrawal from the Settlement Escrow Account, including funds received from the PPT [Pink Panther Trust], Douglas [Weekes, Debtor's brother and trustee of the Children's Trust] shall: (a) Distribute to [Trustee] 77.78% of all funds and retain 22.22%; and (b) Distribute to [Trustee] 100% of all funds after retained funds reach One Million Dollars ($1,000,000.00)."  (*Id.* at ¶¶2-3).

On July 5, 2017, the Children's Trust received $4,342,149.82 from the Pink Panther Trust. (REC_536, ln. 21-22). Of that amount, $3,377,324.13 was transferred to the Trustee for the benefit of the bankruptcy estate. (*Id.*, ln. 22). The Compromise provides that the remaining $964,825.69 is to be retained by the Children's Trust for the benefit of the children. (*Id.*, ln. 23-24). On July 7, 2017,

---

[11] Notably, as noted below, the Cook Islands Trust Funds were repatriated to the United States before the Effective Date, and before the Trustee moved for a court order approving the Agreement.

22

1    Debtor was released from the custody of the United States Marshal Service. (*Id.*,

2    ln. 24-25).

3        **B.      Trustee's Motion for Approval of Compromise**

4            Approximately two weeks after the Pink Panther Trust Funds had been

5    repatriated to a United States escrow account, the Appellee filed a Motion for

6    Order Approving Compromise with the Olson Children's Irrevocable Trust on July

7    18, 2017 ("Approval Motion"). (*See* REC_534-REC_561).

8            Passport objected, primarily on grounds that, pursuant to the United States

9    Supreme Court's recent ruling in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973

10   (2017), the Bankruptcy Court could not approve a compromise agreement that

11   distributed property of the bankruptcy estate (which Passport argued the entirety of

12   the recovered trust funds were) in violation of Passport's first-in-priority lien. (*See*

13   REC_576-REC_587).  Passport also objected to the Compromise on grounds that it

14   rewarded Debtor's fraud and contempt, and that it was simply a bad deal because

15   the Weekes's assistance was never actually needed to repatriate the Pink Panther

16   Trust funds, as Debtor had (and had always had) the power to cause the trustee to

17   relinquish the funds, and therefore $1 million was far too large a payment for

18   providing – at best – a somewhat more expedient solution. (*See Id.*; REC_596-

19   REC_623).

20           On August 15, 2017, counsel for the Trustee transmitted to counsel for

21   Passport an accounting received from the Pink Panther Trust, which Passport then

22   submitted to the court attached to its Supplemental Opposition. (*See* REC_597,

23   REC_604, ¶¶3-5, REC_605-REC_620).  The accounting shows that, both pre- and

24   post-Petition, Debtor at all times herself had the sole ability to move money in and

25   out of the Ora Fiduciary account. (*Id.*).  This evidence further demonstrates that

26   the Weekes family's "assistance" was never required to effect the repatriation of

27   the Pink Panther Trust Funds.

28                                        23

1    In his Reply, the Trustee conceded that, if Passport's property argument is

2    correct – *i.e.*, that one hundred percent of the funds recovered from the Cook

3    Islands Trust are the property of the bankruptcy estate, then the Trustee did not

4    have the authority to give away a portion of the estate without Passport's consent.

5    (REC_652-REC_653, ln. 4).  Trustee also stated that this issue was not one that he

6    had identified prior to Passport's written opposition.  (REC_652, ln. 14-16).[12]

7    ### C.    Tentative Ruling and Hearing on Trustee's Motion

8    The Bankruptcy Court held a hearing on August 29, 2017 to hear argument

9    on the Trustee's Motion ("Motion Hearing").  (*See* REC_178-REC_214 (Motion

10   Hearing Transcript)).  Shortly before the hearing, the Bankruptcy Court issued a

11   tentative ruling granting the Trustee's Motion ("Tentative Ruling") (REC_172-

12   REC_177), based upon the related submissions of the parties, which the parties had

13   reviewed in advance of the hearing.  (*See* REC_181, ln. 2-6).  The Bankruptcy

14   Court would eventually attach and incorporate the Tentative Ruling into its

15   Approval Order without amendment.  (REC_169, ln. 24-25).

16   ### 1.    Bankruptcy Court's Tentative Ruling in Favor of Trustee's

17   ### Motion for Approval

18   The Tentative Ruling acknowledges that "Passport might be legally correct

19   about its rights," (REC_175), and that Debtor had engaged in fraud and contempt

20   (*id.* at REC_173-REC_174), but nonetheless approved the compromise based on

21   the "very unusual" circumstances of the case, in which  Debtor had been

22   incarcerated for approximately one year on contempt charges stemming from her

23   "attempts to apparently dissuade the Cook Islands trustee from repatriating the

24   money" in the "the infamous 'crucifixion memo'" and Debtor's continuing refusal

25

26   ――――――――――――――

27   [12]    Submissions in support of Trustee's Motion were also made by Debtor,
     Erlend Olson, and the Children's Trust.

28                                          24

1    to cause the funds to be repatriated and purge her contempt.  (REC_173).  The

2    court thus relied in part on practical considerations, *i.e.*, the difficulty in and cost

3    involved in the lengthy effort to collect the Pink Panther Trust funds, and the

4    question of whether Debtor could as a practical matter have remained in jail

5    indefinitely until she purged her contempt, concluding that "[a]bsent a compromise

6    approach it is very questionable whether there would even today be anything to

7    discuss here" because there would be "no assets in the estate at all."  (REC_174-

8    REC_176).

9        But the court also expressed an overarching concern about "engaging in

10   duplicitous behavior" by refusal to approve the Compromise after the funds had

11   already been repatriated to the United States, and after the court had (in broad

12   terms) encouraged a settlement to accomplish just that – even if neither the Trustee

13   nor the Debtor and her supporters had asked the court (or Passport, for that matter)

14   to approve the specific Compromise terms in advance of the transfer.  (REC_174).

15       Passport seems to be arguing a form of 'King's X', that is, now that

16       the funds are stateside forget the problems in getting that difficult part

17       accomplished; revert only to consideration of difficulty in collection

18       now *under U.S. law* and renounce any representations made in getting

19       that done.  The court will not participate in such duplicity. While such

20       flexibility might be expected behavior from some debtors, or maybe

21       even from some zealous creditors, it cannot be so for the court (or the

22       Trustee) without major damage to the integrity of the entire process.

23   (REC_175 (emphasis in original)).

24       The Tentative Ruling also purported to distinguish the Supreme Court's

25   opinion in *Jevic*, on grounds it involved a Chapter 11 structured dismissal (not an

26   interim distribution), and that the under "exceptional" circumstances of this case

27   the priority-violating Compromise supposedly serves the objectives of the

28                                25

Bankruptcy Code because "[h]ere the question is between overruling the objection of the major creditor with a secured claim vs. no assets in the estate at all, with administrative creditors going unpaid, potentially forever, and the Debtor remaining in jail on an open-ended contempt charge."[13]  (REC_177).

Nothing in the Tentative Ruling hints at the Bankruptcy Court's deep misgivings about rewarding the Debtor's fraud and contempt – despite also feeling compelled to approve the Compromise – revealed during the Motion Hearing.

### 2.    Motion Hearing

At outset of the Motion Hearing, Passport re-asserted its arguments that the entirety of Cook Islands Trust funds were at all times property of the bankruptcy estate, and thus subject to Passport's first-in-priority claim.[14]  Passport also assured the court – to allay concerns expressed in the Tentative Ruling[15] – that there was

---

[13] As addressed in Argument Section I.A, the Bankruptcy Court misread the reasoning in *Jevic*, which explains that, unlike Chapter 11, priority-violating distributions are *not permitted at all* in the Chapter 7 context.

[14] The trust funds are the property of the estate for three primary reasons (1) those funds were implicated by the State Court judgments that are the basis of Passport's claim against the Estate; (2) the terms of the Priority Order specify that Passport has a first-in-priority claim over all of Debtor's assets, including the Cook Islands Trust funds, recovered under any theory of law; and (3) because the express terms of the Compromise agree that the trust funds are part of the bankruptcy estate, and are subject to Passport's first-in-priority claim. (REC_181, ln 21 - REC_183, ln. 17; REC_187, ln. 2-23).

[15] Debtor had also filed a paper in support of Trustee's Approval Motion which, among other allegations, stated – falsely – that counsel for Passport had

26

4851-7346-5943.v1

no "duplicity" on Passport's part with regard to the terms of the Compromise. (REC_185, ln.13 – REC_186, ln. 8). While Passport had been aware of negotiations between the Trustee and the Debtor and her family members, it did not take part, nor was it shown any form of agreement or asked to consent to the specific terms. (REC_186, ln. 7-9). Passport was aware of the broad terms of the compromise proposal, and had informed the Trustee that Passport "though[t] that the debtor shouldn't be paid a million dollars, and we told the trustee that we objected to the settlement[.]" (*Id.*, ln. 9-12). Passport was not asked to agree to the transfer of the trust funds to the United States (or the related *quid pro quo* in the Compromise), and did not have anything to do with the language of the Compromise that says "all transfers of property by [Debtor] to the Children are avoided, recovered by, and preserved for the benefit of [Debtor's] bankruptcy estate." (REC_187, ln. 7-12). There was therefore no "duplicity" in asserting its legal rights based on the plain terms of the Compromise and the prior rulings of the court.

Passport also reminded the court that these funds had been a fraudulent conveyance by the Debtor in the first place, to avoid debts to Passport, and

previously offered Debtor sums of $1-2 million in exchange for repatriation of the Pink Panther Trust funds, and implied. (REC_641). Debtor also falsely stated that Passport had raised no objection to the Compromise prior to the Trust funds being repatriated and had in fact "actively encouraged it to happen." (REC_642). As noted above, in reality, Passport's counsel had not participated in the Compromise negotiations, had not seen the form of the Compromise agreement until the Trustee's Motion, and had advised the Trustee of its objection to the broad terms of the Compromise, *i.e.*, payment of $1 million to Debtor's children in exchange for repatriation of the funds.

27

approving the Compromise would take a substantial portion of those funds from Passport and hand them right back to the fraudulent transferor.  (REC_188, ln. 22-25).  The Bankruptcy Court was well aware of what was really going on, but was, in its view, left with no real option but to approve the Compromise, for both practical reasons and to avoid any appearance of duplicity:

> Please don't misunderstand.  I'm not saying any of this is right.  Okay?  … I find the whole thumbing the nose at the rule of law to be reprehensible.  Somebody who has built a life out of the rule of law should say no less.  But I'm also a practical guy.  I have to make some hard decisions.  And to get your last million dollars, would have probably involved keeping Jana Olson in jail, more or less, indefinitely.  And I don't know that I can do that.
>
> ***
>
> And she gets out of jail and you got nothing. Now, that's the reality, not that it's right. And under our scheme of law it is illegal, but I can't tell the Cook Islands what their laws are, right?
>
> So that's the practical problem the trustee had to wrestle with. Now, if what you're trying to tell me is that, well, when dealing with frauds we can … go through all these efforts and get a settlement and when it comes state-wise we'll do "King's X" – screw the settlement, we'll take all the money because you're bad guys to have done this in the first place which is more or less as I read your pleading. I can't do that. I cannot do that because that means that that gold eagle [outside the Courthouse] is a vulture like all the rest.

(REC_190, ln. 25 – REC_192, ln. 3).

> … I'm not happy about it. **I'm not happy that a bunch of frauds managed to break off a quarter of the loot here and keep it for the**

28

**kids**.  I don't think it's right, but I … have to play the cards that are
dealt me.  And I was not dealt a very strong hand, despite what you
think.  A year is a long time to spend in jail.

(REC_193, ln. 2-7 (emphasis added)).

Despite these statements, the court was also "troubled" by the argument that
Passport's first-in-priority attached to the entirety of the repatriated funds, and that
the court might be "breaking [its] own word" from the Priority Agreement if it
approved the Compromise.  (REC_194, ln. 3-10).  Trustee's counsel argued, as in
its Reply, that it depended on the interpretation of the term "recovered" – and
conceded that if the court interpreted that the term "property recovered" applied to
100 percent of the repatriated Trust funds, then Passport was correct; if it applied
only to the portion of the funds the Compromise agreed would be transferred to the
estate by the trustee of the Children's Trust, then the remaining funds are not part
of the estate and Passport has no lien right over them.  (*See* REC_194, ln. 11 –
REC_199, ln. 20).

Notably, Trustee's counsel also lamented that, Passport's legal arguments
aside, the Compromise was, as the court had put it, "unpalatable"

there's a certain amount of fairness going back to the Court's
comment about unpalatable alternatives, you know, I can't recall a
time in my 25 plus years, and I don't know if Your Honor can recall a
time, where we were leaving family members of a debtor with close to
a million dollars to resolve what I think is probably a slam dunk
fraudulent transfer action.

(REC_198, ln. 16-20).  The court conceded that Passport's legal position was
strong, and that the Compromise was not only inequitable, but akin to piracy:

There's no question in my mind that Passport has good arguments.
And there's really no question in my mind but that there is part of all

29

4851-7346-5943.v1

1    this that just – ought not to sit well with anybody who believes in the

2    rule of law.  I mean, basically what it is is if you want to take a crude

3    analogy, you don't negotiate with pirates.  There's only one thing you

4    do with pirates, and that is hang them.

5 (REC_205, ln. 12-24).  But the Court quickly backed away from the conclusion

6 that it ought not to approve the results of the Trustee's negotiations with these

7 "pirates," saying instead that the "world's moved on … it's gotten quite a bit more

8 complicated and what I am left with here is the very difficult job of … deciding

9 between unpalatable alternatives."  (*Id.*, ln. 20-24).

10        In the Bankruptcy Court's view, one of these alternatives involved playing

11 "gotcha" with Debtor – because the court had "implored be done from the bench a

12 dozen times" to (in broad terms) "make a settlement to get that money back here so

13 we can have an estate of some kind," it felt that it could not, after the money had

14 been repatriated, refuse to enforce the terms of a settlement agreement that

15 achieved that goal, because that would (again, in the court's view) make the court

16 "one of the pirates."[16]  (REC_206, ln. 14-20).  The "other unpleasant alternative"

17 was to have Debtor taken into custody again, although it was not certain that was

18 viable "because now the money's here."  (*Id.*, ln. 23 – REC_207, ln. 2).  Because

19 "they've already played the card," the court lamented that "I have to really have a

20 time machine," in order to rectify the situation, because it would not "contradict

21 the trustee's efforts and say, 'No, you should have read the fine point." (REC_207,

22 ln. 2-6).

23

24

---

25 [16] The court conceded, however, that "At the end of the day, I have the great

26    advantage that this is not my money and it's [Passport's] problem, not mine."

27    (REC_206, ln. 20-22).

28                                    30

So I'm left in this very unpleasant situation to try to do the best I can.
I'm not happy about it, because I, again, don't think that people ought
to gain advantages by putting money offshore to hide from the laws of
the United States. But I don't know what I can do here to cut back on
that, because so much has happened.

(*Id.*, ln. 7-12).

Passport's "good arguments" about its legal right to the Trust funds ultimately did not factor into the court's decision, because "in the context of a 9019 motion I am supposed to not litigate all of this thing" but instead determine whether the Compromise is "a reasonable exercise and in the best interest of the estate. And I am left with the firm conviction … that it is. The reason is because I don't know what the alternative is." (REC. 206, ln. 5-11). In short, in order to quell unfounded concerns about becoming "one of the pirates," the Bankruptcy Court knowingly set aside Passport's legal rights and allowed "a bunch of frauds" to make off with "a quarter of the loot." (REC_193, ln. 2-3; REC_206, ln. 18-19).

After the Bankruptcy Court ruled from the bench that it would grant the Trustee's motion, Passport requested a 30-day stay pending a planned appeal which was orally stipulated by the Trustee and granted. (*See* REC_211).

**D.    Bankruptcy Court Approves the Compromise and Passport Appeals**

On September 18, 2017, the Bankruptcy Court entered a written order that (1) Appellee's Motion to approve the Compromise was granted; that (2) the $3,377,324.13 received by the Trustee pursuant to the Settlement Agreement is the non-exempt property of the bankruptcy estate and that (3) the Children's Trust may retain the proposed $964,8225.69 settlement amount. (REC_169-REC_177 (the "Approval Order")). The Approval Order attached and incorporated the

31

1   Bankruptcy Court's Tentative Ruling as articulating the court's reasoning.

2   (REC_169).

3        On September 26, 2017, Passport filed its timely Notice of Appeal.

4   (REC_154-REC_168).  On September 29, 2017, at the Bankruptcy Court's

5   direction, the parties filed a written stipulation to extend the temporary stay

6   (REC_718-REC_726); the Bankruptcy ordered an extension of the temporary stay

7   through the resolution of Passport's appeal on October 3, 2017 (REC_727-

8   REC_728).  This Court issued a Notice of Completion of the Bankruptcy Record

9   on November 2, 2017.

### SUMMARY OF THE ARGUMENT

12       All of the funds transferred from the Cook Islands Trust were and are – by

13  operation of the terms of the State Court judgments against Debtor, the Priority

14  Order, and the Compromise itself – property of the Debtor's bankruptcy estate, and

15  subject to Passport's first-in-priority secured claim status.  In a Chapter 7 case,

16  creditor priority is "an absolute command," *Czyzewski v. Jevic Holding Corp.*, 137

17  S. Ct. 973, 983 (2017), and thus the Trustee had no authority to distribute just

18  under one million dollars of the bankruptcy estate to a non-party over the objection

19  of the first-in-priority creditor, and it was a per se abuse of the Bankruptcy Court's

20  discretion to approve it.  *In re Debbie Reynolds Hotel & Casino*, 255 F.3d at 1065

21  (approval of a settlement agreement based on an erroneous interpretation of the

22  law is a per se abuse of discretion); *see also In re Arden*, 176 F.3d at 1228.

23       Even if the Bankruptcy Court had discretion to approve such a Compromise,

24  the terms of the agreement must still support the objectives of the Bankruptcy

25  Code, *Jevic,* 137 S. Ct. at 985, and must, under well-established Ninth Circuit

26  precedent, be "fair and equitable," *In re Woodson*, 839 F.2d 610, 620 (9th Cir.

27  1988).  The Compromise cannot meet either test.  Indeed, the Compromise actively

28                                            32

1  *undermines* the objectives of the Bankruptcy Code by – in the Bankruptcy Court's
2  own words – rewarding "a bunch of frauds" by permitting them to "break off a
3  quarter of the loot here and keep it for the kids." (*See* REC_193, ln. 2-4).  The
4  Code contains a number of provisions (*e.g.*, nondischargability) designed to
5  prevent misuse of the Code to abet fraud.  This Compromise is merely a back door
6  approach that allows a fraudulent Debtor – despite the Bankruptcy Court's
7  nondischargability order against her – to make off with a substantial portion of the
8  "loot."  For similar reasons, a Compromise that unnecessarily gifts $1 million in
9  Estate assets to parties closely associated with the malfeasant Debtor cannot be
10  held "fair and equitable."

11      Neither the Appellee nor the Bankruptcy Court disputes that the Debtor
12  fraudulently transferred assets to avoid her debts to Passport (and other creditors),
13  and has acted in flagrant contempt of the Bankruptcy Court and the Superior Court
14  in her attempts to avoid paying her debts.  By the Bankruptcy Court's own
15  admission, its approval of the Compromise rewards the Debtor's "piracy."  Worse,
16  it creates a roadmap for other miscreant debtors to hide assets from legitimate
17  creditors.  The Bankruptcy Court's concern that refusal to approve the
18  Compromise after the repatriation of the funds would be "duplicity" was
19  misplaced, since neither the court nor Passport had given approval beforehand –
20  and in any case does not outweigh the inequity of rewarding a fraudulent Debtor at
21  Passport's expense.  Similarly, the Bankruptcy Court's and the Trustee's
22  frustration at Debtor's obstinacy does not justify a $1 million payment that is
23  tantamount to a bribe.

24      The Bankruptcy Court's Approval Order was therefore an abuse of its
25  discretion should be reversed.

26

27

28                                              33

# ARGUMENT

## I. The Approval Order Is a *Per Se* Abuse of Discretion Because It Violates the "Absolute Command" of Chapter 7's Priority Scheme

The Bankruptcy Court's approval of the Compromise – which agreed to a priority-violating transfer of Estate assets to a non-party – was a *per se* abuse of the Bankruptcy Court's discretion because "[i]n Chapter 7 liquidations, priority is an absolute command—lower priority creditors cannot receive anything until higher priority creditors have been paid in full." *Jevic*, 137 S. Ct. at 983 (citing 11 U.S.C. §§ 725, 726); *see also In re Debbie Reynolds Hotel & Casino*, 255 F.3d at 1065 ("To the extent that the bankruptcy court's approval of the settlement agreement rested on an erroneous interpretation of law, it was, per se, an abuse of discretion."); *see also Koon v. United St*ates, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").

The funds from the Cook Islands Trust were at all relevant times property of the Estate, and thus subject to Passport's first-in-priority lien.  Here, the Children's Trust is not a creditor at all (and thus has no priority), but instead a post-petition vehicle created specifically to effectuate the retention of the fraudulent conveyance of the Debtor, for the benefit of non-parties who are intimately connected with the Debtor.  The Bankruptcy Court's approval of the Compromise – however reluctantly granted – therefore violates the Bankruptcy Code's "absolute command" in the context of this Chapter 7 case to follow priority system for the distribution of a bankruptcy estate's assets that "has long been considered fundamental to the Bankruptcy Code's operation." *Jevic*, 137 S. Ct. at 984.

4851-7346-5943.v1

1       **A.**    **The Bankruptcy Court Had No Discretion to Permit a**

2              **Distribution That Violates Priority Without Passport's Consent**

3         Under the Bankruptcy Code, secured creditors must be paid first before any

4   other priorities come into play. *See U.S. v. Speers*, 382 U.S. 266, 269, n.3 (1965)

5   (holding that "[s]ecured creditors, including those whose security was obtained

6   subsequent to creation of the Government's lien, would have recourse to their

7   security before any of the Bankruptcy Act priorities come into play"); *accord*

8   *Goggin v. Division of Labor Law Enforcement of California*, 336 U.S. 118, 126-28

9   (1949). And, as *Jevic* instructs, in Chapter 7 case distributions priority must be

10  strictly enforced, essentially creating a veto for priority creditors like Passport.

11        Although *Jevic* concerned the structured dismissal of a Chapter 11 case, its

12  reasoning and holding apply to distributions in Chapter 7 liquidations – indeed, the

13  Court specifically contrasted the limited flexibility in the Chapter 11 context to

14  permit a priority-violating *interim* distribution, with the rigid application of priority

15  in the Chapter 7 context: "[t]he Code also sets forth a basic system of priority ...

16  and makes clear that distributions of assets in a Chapter 7 liquidation ***must follow***

17  ***this prescribed order***." *Jevic*, 137 S. Ct. at 979 (emphasis added) (citing 11 U.S.C.

18  §§ *725, 726*) and 983 (***"[i]n Chapter 7 liquidations, priority is an absolute***

19  ***command***-lower priority creditors cannot receive anything until the higher priority

20  creditors have been paid in full") (emphasis added). Based on the Supreme

21  Court's express inclusion of Chapter 7 liquidations in its analysis and its

22  recognition that a Chapter 7 liquidation is rigid when it comes to priority-order

23  distributions, the Supreme Court's holding and reasoning in *Jevic* plainly extends

24  to *all* distributions Chapter 7 cases, and not just end-of-case distributions, as the

25  Bankruptcy Court supposed.

26        The Bankruptcy Court incorrectly distinguished *Jevic* on the ground that its

27  Order did not end the case – apparently on the theory that "*Jevic* allows a departure

28                           35

from strict priority distribution where other goals of the bankruptcy process are thus advanced, such as financing litigation or enabling reorganization, *nor involving a dismissal.*" (*See* REC_176). But this ignores the Supreme Court's reasoning that *in the Chapter 11 context* an interim distribution that violates priority *may* serve "other Code-related objectives", such as preserving the debtor as a going concern or paying debtor's employees' pre-petition wages, do not apply in Chapter 7 liquidation. In the Bankruptcy Court's view, its Approval Order complied with *Jevic*'s analysis of interim distributions because the Compromise (in the Bankruptcy Court's view) met the significant Code-related objectives because it allowed the case to live on and for Passport to recover "something as opposed to nothing." (*Id.*).[17]

This ignores the crucial difference between a Chapter 7 liquidation and Chapter 11 – unlike the Supreme Court's discussion of Chapter 11 cases like *Iridium*, the interim distribution of the Cook Islands Trust fund here *will not* serve other Code-related objectives, but will instead merely enrich a Debtor who is a fraud and contemnor. The funds in question were always the property of the estate, subject to Debtor's obligation to turn them over, and subject to Passport's first-in-priority lien. The Bankruptcy Court's approval of the Compromise

---

[17] Notably, although the Bankruptcy Court's Tentative Ruling raises practical considerations (funding the estate) as a Code-related goal, similar practical considerations raised in *Jevic* by the lower courts were not sufficent to overcome the Chapter 11 priority scheme in the context of a final distribution. *See* 137 S. Ct. at 982 ("[s]pecifically, the court predicted that without the settlement and dismissal, there was 'no realistic prospect' of a meaningful distribution for anyone other than the secured creditors ... A confirmable Chapter 11 plan was unattainable.").

4851-7346-5943.v1

1  essentially agrees to pay a ransom to the Debtor for funds that it was always her
2  obligation to relinquish to the bankruptcy estate, and which were in her possession
3  through fraudulent transfers in the first instance.  The Code's distinction between
4  priority distributions in the Chapter 7 "true bankruptcy" context and Chapter 11
5  reorganizations is, at least in part, intended to shield priority creditors like Passport
6  from such slights of hand.

**B.    The Funds at Issue Are Irrefutably Property of the Estate and**
7
8  **Subject to Passport's First-in-Priority Claim**

9          As the Trustee has conceded, his authority to agree that a portion of the
10  Cook Islands Trust funds could be retained by Debtor's family for the benefit of
11  her children depends entirely upon whether (and when) the all of the funds were
12  part of the Debtor's bankruptcy estate.  (*See* REC_652-REC_653, ln. 4; REC_194,
13  ln. 11 – REC_199, ln. 20).  If the funds are part of the estate, Trustee agrees that he
14  would need Passport's consent to the transfer.  (REC_653, ln. 2-4).  Nonetheless,
15  the Trustee made a deal to gift nearly $1 million in bankruptcy estate funds to the
16  Debtor's children – non-parties to the bankruptcy action with no priority status
17  whatsoever – without the consent and over the objection of first in priority creditor
18  Passport, and the Bankruptcy Court approved the deal, despite conceding that
19  Passport's property-based arguments were strong.  The record is clear, however,
20  that the Cook Islands Trust Funds were at all times part of Debtor's bankruptcy
21  estate, both prior to the Compromise and pursuant to:  (1) the express terms of the
22  Compromise; (2) the express terms of the Priority Order, which also establishes
23  that these funds are subject to Passport's first-in-priority lien; and (3) pursuant to
24  the operation of the judgments against Debtor in the State Court Action.

25          First, the Compromise recites that "[Debtor] made certain transfers [of
26  funds] to [the Children,] including naming them as primary beneficiaries of the
27  [Pink Panther Trust]" and further recites that "[Trustee] claims that all funds

28                                      37

1  transferred by [Debtor] to the Children[,] including the funds in the [Pink Panther

2  Trust,] belong to [Debtor's] bankruptcy estate or that any rights of the Children to

3  such funds are subject to avoidance and recovery as fraudulent transfers.

4  (REC_547, Recitals C and F).  Notably, but not surprisingly in light of these

5  recitals, the Compromise also expressly provides that "**all transfers of property**

6  **by [Debtor] to the Children are avoided, recovered by, and preserved for the**

7  **benefit of [Debtor's] bankruptcy estate**." (REC_548, ¶2 (emphasis added)).

8       Second, the Priority Order approving Passport's allowed first-in-priority

9  claim secured by the property of the bankruptcy estate, issued in conjunction with

10  Trustee's compromise agreement with Passport, expressly recites that Passport's

11  pre-petition judgment liens attached to *all* property of the estate – including the

12  Pink Panther Trust funds – regardless of whether, as the Trustee initially disputed,

13  Passport could establish its pre-petition liens on all of Debtor's assets. (*See*

14  REC_405, ln. 8-18 (agreeing, *inter alia*, that "all property recovered under any

15  theory of law or by consent from trust(s) settled by Debtor in the Cook Islands

16  **including the 'Pink Panther Trust' … shall constitute property of the estate**

17  **subject to Passport's first-in-priority secured claim**." (emphasis added)).

18       Prior to reaching this agreement with Passport, the Trustee disputed

19  Passport's contention that its judgment liens attached to, and it had a constructive

20  trust over, all of Debtor's property, wherever located.  Trustee's concession was in

21  return for Passport's agreement to a carve-out for payment of allowed

22  administrative claims and for payment of all other unsecured claims *pari passu* as

23  if Passport's claim were not secured. (*See* REC_531 (Priority Order describing

24  Passport's carve-out)).  Thus, as the Priority Order expressly recognizes, all of the

25  Cook Islands Trust funds are property of the bankruptcy estate, and Passport's

26  first-in-priority lien attaches to all of those funds regardless of whether Passport's

27  liens extended to these same funds while they were located in the Cook Islands,

28

4851-7346-5943.v1

1    either before or after what the Trustee in the Compromise accurately characterizes

2    as the Debtor's fraudulent conveyance of the trust funds to Debtor's Children.

3         Finally, the State Court Action Judgments issued against Debtor in

4    Passport's favor also establish that the Pink Panther Trust funds are, and have

5    always been, property of the bankruptcy estate.  Pursuant to the Superior Court's

6    October 2014 Judgment, "[Debtor] and all persons acting in concert with her, must

7    restrain and enjoin to pay to Passport all of the fraudulent transfers…" (*See*

8    REC_294, ¶3(c)).  Trust was funded, within weeks of Debtor being served with

9    Passport's State Court Action and at Debtor's direction, with fraudulent transfers

10   from the Shell Companies that the Superior Court ruled were Debtor's alter egos,

11   and Debtor also fraudulently transferred her interest in the trust to her children

12   within days of being served, for no value and in a further attempt to conceal the

13   funds from Passport.

14        Thus, there can be no dispute – and the Trustee and the Children's Trust are

15   estopped by the express terms of the Compromise from denying – that *all* of the

16   funds recovered from the Cook Islands Trust, including the $964,825.69 at issue,

17   were transferred to a United States bank account in the name of the Children's

18   Trust under an agreement between the Trustee and the Children's Trust *that all of*

19   *the funds received were and are to be considered the Debtor's own money and*

20   *property of the estate* and, thus, not the Debtor's children's property, much less the

21   property of the Children's Trust.

22        Indeed, the Bankruptcy Court acknowledged the viability of Passport's legal

23   claims to the Cook Islands Trust funds, and also acknowledged the fact that the

24   Debtor was "get[ting away with the loot." (*See* REC_205; REC_193).  But the

25   Bankruptcy Court appeared to believe that, in the Rule 9019 context, it was not

26   required to strictly apply the law when using its discretion to approve a settlement.

27   (*See* REC_173; REC_206, ln. 5-11)  That is precisely backward – in fact, a court

28                                            39

1  has *no discretion* to contravene the law, and therefore must determine whether a
2  proposed compromise is, in fact, legal in the first place before it can be approved.
3  *In re Debbie Reynolds Hotel & Casino*, 255 F.3d at 1065.  The Bankruptcy Court's
4  approval of the Trustee's agreement to gift any of the Estate's funds to the
5  Children's Trust was therefore a per se abuse of discretion under the Bankruptcy
6  Code.  *See Jevic*, 137 S. Ct. at. 983 (citing 11 U.S.C. §§ 725, 726).

7  **II.**    **Approving a "Compromise" that Rewards Debtor's Fraud and**
8         **Contempt and Undermines the Bankruptcy Code's Procedural**
9         **Safeguards Was Also a *Per Se* Abuse of Discretion**

10         Even if a priority-skipping compromise had been legal here, it would still
11  have been an abuse of the Bankruptcy Court's discretion to approve it.  Under
12  well-established Ninth Circuit precedent, a compromise agreement must be found
13  "fair and equitable" to be approved under FRBP 9019.  *In re Woodson*, 839 F.2d at
14  620.  The Compromise cannot meet the "fair and equitable" standard for many
15  reasons – not least of which is that it rewards the Debtor's fraudulent acts and
16  subsequent contempt of court (at Passport's expense) by giving away a large
17  portion of the Estate to Debtor's children under the dubious premise that their
18  relatives' assistance was required to repatriate the Cook Island Trust funds.

19         Further, as a federal bankruptcy court applying *Jevic* in the context of a
20  Chapter 11 interim compromise agreement recently explained, "[i]n light of the
21  Supreme Court's recent ruling in *Jevic*, parties who seek approval of settlements
22  that provide for a distribution in a manner contrary to the Code's priority scheme
23  should be prepared to prove that the settlement is not only 'fair and equitable' …
24  but also that any deviation from the priority scheme for a portion of the assets is
25  justified because it serves a significant Code-related objective."  *See In re Fryar*,
26  570 B.R. 602, 610 (Bankr. E.D. Tenn. 2017).  Here, approval of the Compromise

27

28                                         40

1    instead *undermines* the Bankruptcy Code's objectives, *inter alia*, by circumventing

2    the Code's clear provisions intended to prevent and punish fraud.

3    **A.    The Compromise Should Not Be Approved Because It Is Not**

4    **"Fair and Equitable" for the Creditors**

5        In determining the fairness, reasonableness, and adequacy of a proposed

6    compromise or settlement agreement, the court must consider:  "(a) [t]he

7    probability of success in the litigation; (b) the difficulties, if any, to be encountered

8    in the matter of collection; (c) the complexity of the litigation involved, and the

9    expense, inconvenience and delay necessarily attending it; (d) the paramount

10   interest of the creditors and a proper deference to their reasonable views in the

11   premises." *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir.

12   1986), cert. denied 479 U.S. 854 (1986); *see also In re MGS Mktg.*, 111 B.R. 264,

13   267 (B.A.P. 9th Cir. 1990) (analyzing a compromise under FRBP 9019 and noting

14   that a "bankruptcy court … may only approve a proposal that is fair and

15   equitable").  When determining whether a settlement is "fair and equitable" under

16   Federal Rules of Bankruptcy 9019, the most important factor for a bankruptcy

17   court to consider is "whether a particular settlement's distribution scheme complies

18   with the Code's priority scheme." *Motorola, Inc. v. Official Comm. of Unsecured*

19   *Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 464 (2nd Cir. 2007); *see*

20   *also In re de Armond*, 240 B.R. 51, 54 (C.D. Cal. 1999).

21       The Bankruptcy Court abused its discretion in finding that the Compromise

22   is fair and equitable, because the agreement wastes estate assets and – as the

23   Bankruptcy Court lamented – actually rewards Debtor's "piracy."  More

24   specifically, the Compromise fails the four-factor analysis outlined in *In re A & C*

25   *Properties*, 784 F.2d at 1381, for approving a compromise under FRBP 9019.

26       First, with regard to the probability of success element in litigation, by the

27   Trustee's own admission, he "is confident that the Estate's position is well-

28                                              41

1    founded and the subject transfers could be avoided." (*See* REC_539, ln. 24-25); *see*

2    *also* REC_198, ln. 16-20) ("I can't recall a time in my 25 plus years ... where we

3    were leaving family members of a debtor with close to a million dollars to resolve

4    what I think is probably a slam dunk fraudulent transfer action."). The facts

5    support the Trustee's assessment. Debtor's transfer of the Miyim Trust funds to

6    the Pink Panther Trust were fraudulent because Debtor made them within weeks

7    after being sued by Passport and "because [Debtor's] children did not provide any

8    reasonably equivalent value in exchange for acquiring their interests in the offshore

9    trust." (*See* REC_535; *see also* REC_579, REC_584). As admitted, the Trustee

10   has a strong case and would likely succeed in litigation. As such, the probability of

11   success does not weigh in favor of approving the Compromise.

12        Second, with regard to the difficulty in collecting on a potential judgment

13   obtained by the Trustee, this factor, too weighs against approving the Compromise.

14   Arguably, the largest obstacle in obtaining the funds was moving them from the

15   Cook Islands to the United States. But because the subject funds have already

16   been transferred to the United States without condition and are currently located in

17   California and in the possession of the Children's Trust, the funds are no longer

18   subject to Cook Islands territorial jurisdiction or laws, and a California judgment

19   would be easier to enforce. Once the Trustee obtained a judgment against the

20   Children's Trust, he would have been able to enforce it through the usual means

21   provided by federal and state law.

22        While the Bankruptcy Court took issue with Passport's application of United

23   States law to this factor, because the Trust funds were only in the U.S. because the

24   Debtor and her supporters had executed their part of the Compromise agreement,

25   and because it did not want to "participate in ... duplicity" by refusing to approve

26   the remaining terms of the Compromise (Tentative Ruling at 6), the court ignored

27   that neither Passport nor the Bankruptcy Court ever promised Debtor anything in

28                                         42

return for repatriating the funds.  Other than encouraging the Debtor to purge her contempt so that he could release her from jail, and parties to find an alternative solution to repatriating the funds in case the Debtor continued to refuse, the Court played no role in bringing about *this* Compromise and it was certainly never asked to approve these terms in advance of the transfer of funds to the United States.

The Compromise was contingent, however, on the approval of the Bankruptcy Court, and so executing the funds transfers *before* seeking the court's approval of the Compromise was a risk, but also quite possibly a gambit to increase the likelihood that the court (and Passport) would acquiesce.   The gambit apparently succeeded, at least as far as the Bankruptcy Court is concerned.  But the court misperceived the equities here – it was under no obligation to approve a deal it had never agreed to in the first place, when all the Debtor had done was to repatriate funds *as the Bankruptcy Court had ordered her to do*.  Even if the Bankruptcy Code allowed for discretion to approve the Compromise – and it does not – it cannot be "fair and equitable" to *reward* the Debtor for creating the court's dilemma in the first place.

Third, the complexity of litigation, the expense, inconvenience and delay also weigh against approval. The Trustee has admitted that "the legal issues regarding avoidance of the transfers were not substantively complex." (REC_540). The only "complex" issue noted was the enforcement of a judgment of the United States in the Cook Islands.  But, as discussed above, this is no longer an obstacle because the funds at issue are now in the United States, and subject to United States law. (*See* REC_548, ¶2).  Further, any anticipated litigation would be quickly resolved because, as the Trustee admits, the Trustee has a strong case and prior judgments and facts establish that the Children's Trust is not entitled to the Pink Panther Trust funds.   Because the only "complex" issue in potential litigation

43

1    has been resolved and anticipated litigation would be quickly resolved in favor of

2    the estate, this factor weighs squarely against approving the Compromise.

3         Finally, with regard to whether the Compromise serves "the paramount

4    interest of the creditors" – which, as noted above is the most important factor – a

5    Compromise that unnecessarily breaks off nearly $1 million in estate assets for the

6    benefit of the Debtor's family inherently does not serve the interests of the

7    creditors.  To the extent that the Bankruptcy Court reasoned that it was faced with

8    deciding "between overruling the objection of a major creditor with a secured

9    claim vs. no assets in the estate at all," under *Jevic*, the court did not appreciate (as

10    it acknowledged at the hearing) that this is ultimately Passport's money (*see*

11    REC_206, ln. 20-22), and therefore its prerogative to agree whether the

12    Compromise is or is not in its best interest.  *See generally In re Fryar*, 570 B.R. at

13    610 ("Failing to approve this settlement may result in the unsecured creditors

14    getting nothing, but that is their decision to make if they want to see if they can

15    find a better deal for the Debtor's stock interests. The fact that this settlement

16    disregards the priority scheme contained in the bankruptcy code entitles them to

17    ask the court for close scrutiny of the proposed compromise and the prospects for

18    reorganization.") (applying *Jevic* in the context of reviewing a proposed Chapter

19    11 compromise agreement).

20        **B.**    **The Compromise Undermines the Objectives of the Bankruptcy**

21              **Code**

22         Finally, *Jevic* instructs that priority-violating compromise agreements – in

23    the limited circumstances in which they are allowed at all (*i.e.*, interim Chapter 11

24    distributions) – made without approval of the affected creditors must *at least* serve

25    other significant objectives of the Bankruptcy Code, whereas distributions that

26    "circumvent the Code's procedural safeguards" should be rejected.  *See* 137 S. Ct.

27    at 985-86.  The Compromise is squarely in the second category.

28

4851-7346-5943.v1

The Compromise actively undermines the objectives of the Bankruptcy Code and "circumvents the Code's procedural safeguards" by – in the Bankruptcy Court's own words – rewarding "a bunch of frauds" by permitting them to "break off a quarter of the loot here and keep it for the kids." (*See* REC_193, ln. 2-4). The Code contains a number of provisions – like the nondischargability of debts premised on fraud, or concealed by fraud – that are intended to prevent misuse of the Code to abet fraud.  This Compromise is merely a back door approach that allows a fraudulent Debtor – despite the Bankruptcy Court's nondischargability order against her – to make off with a substantial portion of the "loot."

The Bankruptcy Court's distaste for the "unpalatable options" that the Debtor's fraud and contempt created in this case might be understandable – but it was an abuse of discretion to approve a Compromise that both wastes estate assets and partially mitigates a nondischargability order that was issued against Debtor under Code provisions that are designed to prevent the use of the Code to abet fraud.

## CONCLUSION

Because the Cook Islands Trust funds were the property of the bankruptcy estate, and because Bankruptcy Code precludes priority-violating distributions such as that in the Compromise absent the agreement of the affected creditors in the context of a Chapter 7 liquidation, the Bankruptcy Court abused its discretion by approving an illegal distribution of estate funds.  Even if that were not so, the proposed Compromise is – as discussed at length herein – in no sense "fair and equitable," and undermines the objectives of the Bankruptcy Code by abetting fraud, and thus the Approval Order was an abuse of discretion for this reason as well.

4851-7346-5943.v1

1    The lengthy record in this case and the related State Court Action – of which

2    only the broad outlines are recounted here – aptly illustrates that the Bankruptcy

3    Court's characterizations of the Debtor as and her associates as "a bunch of frauds"

4    and "pirates" was not mere hyperbole, but squarely on the mark.  Contrary to the

5    Bankruptcy Court's reasoning, however, declining to approve a deal that abets and

6    rewards the Debtor's fraud and contempt of the courts does not make the court a

7    fellow pirate – though arguably *assisting* the pirates might.  Passport does not

8    suggest that the Bankruptcy Court in any way intended to aid or endorse the

9    Debtor's fraud, but that was the undeniable effect of the Approval Order.

10    The Approval Order should accordingly be reversed.

12    DATED: December 4, 2017

PILLSBURY WINTHROP SHAW
PITTMAN LLP
By: _____ */s/* _____
Philip S. Warden (Cal. Bar No. 54752)
Thomas V. Loran III (Cal. Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: (415) 983-1000
Fax: (415) 983-1200
thomas.loran@pillsburylaw.com
philip.warden@pillsburylaw.com

Cynthia Cook Robertson (*On Brief*)
1200 Seventeenth Street, N.W.
Washington, DC 20036
Phone (202) 663-9656
cynthia.robertson@pillsburylaw.com

*Counsel for Creditor Passport
Management, LLC*

46

4851-7346-5943.v1

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bank. P. 8015(a)(7)(C), the undersigned certifies that the preceding Brief of Appellant Passport Management, LLC complies with the type-volume limitation in Fed. R. Bankr. P. 8015(a)(7)(B)(i), Local Rule 11-3.1.1, and the Standing Order for Cases Assigned to this Court, because has been prepared in Times New Roman style 14-point font and contains 13,496 words, excluding the items identified in Fed. R. Bank. P. 8015(a)(7)(B)(iii).

4851-7346-5943.v1

**PROOF OF SERVICE BY ECF AND OVERNIGHT COURIER**

I, Deirdre Campino, the undersigned, hereby declare as follows:

1.      I am over the age of 18 years and am not a party to the within cause.  I am employed by Pillsbury Winthrop Shaw Pittman LLP in the County of San Francisco, State of California.

2.      My business address is Four Embarcadero Center, 22nd Floor, San Francisco, CA  94111-5998.  My mailing address is P.O. Box 2824, San Francisco, CA  94126-2824.

3.      On December 4, 2017, in the city where I am employed, I served a true copy of the attached document(s) titled exactly **BRIEF OF APPELLANT PASSPORT MANAGEMENT, LLC; APPENDIX TO OPENING BRIEF OF APPELLANT PASSPORT MANAGEMENT, LLC:  EXCERPTS OF THE RECORD PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8018(B), VOLUMES I and II; and the DECLARATION OF THOMAS V. LORAN III REGARDING SUPPLEMENTATION OF RECORD ON APPEAL**, electronically to the parties of record in this matter through the Court's ECF System, and also by depositing it/them in a box or other facility regularly maintained by FedEx, an express service carrier providing overnight delivery, or delivering it to an authorized courier or driver authorized by the express service carrier to receive document, in an envelope or package designated by the express service carrier, with overnight delivery fees paid or provided for, clearly labeled to identify the person being served at the address shown below:

4851-7346-5943.v1

| | |
|---|---|
| United States Trustee<br>Attn.:  Frank Cadigan<br>411 W. Fourth Street, Suite 9041<br>Santa Ana, CA  92701<br>Tel:  (714) 338-3400 | D. Edward Hays, Esq.<br>Marshack Hays LLP<br>870 Roosevelt Avenue<br>Irvine, CA  92620<br>Tel:  (949) 333-7777<br><br>*Counsel for Appellant, Chapter 7<br>Trustee Richard A. Marshack* |
| Cicely T. Ray, Esq.<br>Cicely T. Ray & Associates<br>4740 Green River Road, Suite 314<br>Corona, CA  92880<br>Tel:  (951) 735-2488<br><br>*Counsel for Interested Party Olson<br>Children's Irrevocable Trust* | Michael H. Weiss, Esq.<br>Weiss & Spees<br>1925 Century Park East, Suite 650<br>Los Angeles, CA  90067<br>Tel:  (424) 245-3100<br><br>*Counsel for Creditor Erland Olson* |
| Jana W. Olson, Debtor<br>In Pro Per<br>431 Vista Grande<br>Newport Beach, CA  92660<br>Tel:  (949) 500-4793 | Barret Weekes, Trustor of Olson<br>Children's Irrevocable Trust<br>In Pro Per<br>431 Vista Grande<br>Newport Beach, CA  92660 |

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 4th day of December, 2017, at San Francisco, California.

_Deirdre Campino_
Deirdre Campino